## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM, | Case No. CF 0144-14 |
| vs. | |
| DONALD CASTRO ALDAN and IVAN LEEBRICK SABLAN CABRERA, | DECISION AND ORDER ON DEFENDANT ALDAN'S MOTION TO SUPPRESS STATEMENTS, PHYSICAL EVIDENCE |
| Defendants. | |

### INTRODUCTION

This matter came before the Honorable Alberto C. Lamorena III on June 18, 2014 on Defendant Aldan's Motion to Suppress Statements, Physical Evidence. Attorney Terence E. Timblin represents Defendant Aldan and Assistant Attorney General James C. Collins represents the Government. For the reasons set forth below, the Court grants the Motion.

### BACKGROUND

Per the Indictment returned on April 1, 2014, Defendant is charged with possession of a Schedule II controlled substance, i.e., an amphetamine-based substance. The charge stems from an incident on March 21, 2014 in which Defendant allegedly fled from the vicinity of a Dededo residence while officers of the Guam Police Department (GPD) and agents of the United States Air Force executed a search warrant at the residence. Officers pursued Defendant, apprehended him, and eventually recovered evidence from his person and received incriminating statements from him. The warrant did not name Defendant, nor did he reside at the residence. At the time

Mike Flores resided on the property. In particular, the Affidavit alleged that Jesse Acfalle possessed the rocket launcher, while all three were distributing methamphetamine; there was no reference to Defendant.

At 6:15 P.M on March 21, 2014, the police executed the warrant. Upon arrival, officers observed Defendant "flee east towards the jungle." At that time, officers were unaware of Defendant's identity. Officer Santos testified that Defendant was sitting five to ten feet from the residence with other persons when he saw the police and fled; the pursuit lasted less than five minutes and covered about one hundred feet. During the chase, Officer Santos repeatedly identified himself as a police officer and ordered Defendant to stop. Officer Santos also testified that, when Defendant fled, Officer Santos did not know if Defendant was one of the targets listed in the search warrant. In his report, Officer Santos asserted:

> "I was able to catch up to [Defendant] and secure him into handcuffs. The male was later identified as [Defendant]. I then conducted a quick pat down on [Defendant] for weapons however I located none. After securing [Defendant] in handcuffs, I then verbally advised [him] of his rights via Miranda Rights Card and asked him why he ran away. He replied I'm just scared of the police[. . . .] Custody of [Defendant] was then relinquished to the CID agents[. . . .] I was later contacted by Officer Camacho who informed me that drug paraphernalia was located on [Defendant] and [Defendant] was later arrested[.]"

In his police report, Officer T. A. Supnet[1] (Officer Supnet) indicated that Defendant was transported to the Criminal Justice Strike Force office in Tiyan (Tiyan station) "for further interview." Officer Supnet further reported that, at 7:45 P.M., "[p]rior to conducting a formal interview of [Defendant, I] conducted a cursory pat down where I felt what appeared to be an object within [Defendant's] front right pocket of his brown cargo shorts. I requested for [Defendant] to remove everything within his pocket, which later revealed" methamphetamine and related paraphernalia. At 7:50 P.M., Officer Supnet advised Defendant of his Miranda rights, which Defendant acknowledged and waived, and, at 7:52 P.M., the "interview" of Defendant commenced. Defendant admitted to methamphetamine use and possession, and "also informed [Officer Supnet] that [Defendant] was currently on parole and has not checked in with

---

[1] In the police report, Officer Supnet is listed as the Assigned Investigator and Officer F. M. Camacho is listed as the Approving Supervisor.

his parole officer. [Defendant] admitted that he has an active 'Warrant of Arrest' which [Officer Supnet] verified[.]" The interview stopped for an unknown period of time for Defendant to receive medical treatment. At 8:28 P.M., the interview resumed and Defendant again admitted to methamphetamine use and possession. At 8:30 P.M., Officer Supnet arrested Defendant for possession of a Schedule II controlled substance pursuant to 9 GCA § 67.401.2, for resisting arrest pursuant to 9 GCA § 55.35, and in accordance with the outstanding arrest warrant.[2]

## II.    Reasonable Suspicion

The resolution of Defendant's Motion turns on whether, when, and to what extent the police were entitled to detain, search, or arrest Defendant. The Fourth Amendment, made applicable to Guam via the Organic Act, provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV; 48 USC § 1421b(c). "The Fourth Amendment permits brief detentions when a police officer has a reasonable suspicion that an individual was engaged in or is about to be engaged in illegal conduct." People v. Johnson, 1997 Guam 9, ¶ 4 (citing Terry v. Ohio, 392 U.S. 1 (1968)). This principle is codified in the Stop and Frisk Act, 8 GCA § 30.10, et seq. See Guam v. Taman, 2013 Guam 22, ¶ 21; People v. Cundiff, 2006 Guam 12, ¶¶ 39-40. If an investigative detention reveals probable cause for arrest, "the person shall be arrested." 8 GCA § 30.40; see also 8 GCA § 20.15 (officer may arrest without warrant upon "reasonable cause"). "An arrest is made by an actual restraint of the person, or by submission to the custody of the person making the arrest." 8 GCA § 20.10.

As a preliminary matter, Defendant correctly argues that that the search warrant, by itself, did not authorize the search of his person. There is no evidence to suggest that Defendant was a target of the warrant or was even known to police until after his apprehension. Although

---

[2] The facts set forth for the Declaration accompanying the Magistrate's Complaint dated March 22, 2014 differ in material respects from the facts set forth herein, which derive from Officer Santos' testimony as well as police reports drafted by Officer Santos and Officer Supnet. In particular, the Declaration seems to suggest that the contraband was discovered when Officer Santos subdued Defendant after his flight, rather than later at the Tiyan station. This account is unsupported by the testimony and police reports, and neither the Government nor Defendant adopts this interpretation of the facts. The parties agree, rather, that the pat-down and interview of Defendant at the Tiyan station yielded the evidence and statements that Defendant seeks to suppress.

the warrant authorized police to search the premises, the warrant did not support a search of Defendant. See Ybarra v. Illinois, 444 U.S. 85, 91-96 (1979) (where police held warrant to search tavern, patrons' mere presence in tavern did not "give rise to probable cause to search" them or reasonable suspicion to frisk them for weapons).

Defendant next contends that his flight from the residence did not give rise to "reasonable suspicion to detain him." An officer with a reasonable suspicion that an individual "committed, was committing, or was about to commit a criminal offense" may detain that person to investigate such criminal activity. 8 GCA §§ 30.10, 30.20. Moreover, if an officer "reasonably believes" that the target of the detention "is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or another, the peace officer may search such person to the extent necessary to disclose, and for the purpose of disclosing, the presence of such weapon." 8 GCA § 30.50.

Officers secured the warrant to search for drugs and weapons, including a rocket launcher and shotgun; Officer Santos characterized the search as concerning a "possible rocket launcher" and "possible drug lab." The warrant also identified three residents allegedly responsible for such criminal activities. A total of twenty GPD officers and Air Force agents were utilized to execute the warrant. Officers were unaware if Defendant was one of the individuals listed in the search warrant, Defendant fled the premises upon seeing the police arrive, and Officer Santos detained and conducted a pat-down of Defendant. Taken together, these facts cannot support the conclusion that Officer Santos acted unreasonably. Indeed, "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: [i]t is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (holding that defendant's unprovoked flight from officers in area of heavy narcotics trafficking supported reasonable suspicion that defendant was involved in criminal activity and justified stop that yielded firearm). Similarly, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Id. (citations omitted). Moreover, it is reasonable for officers to suspect that an individual who is present at— and flees from—such premises would be involved in its criminal activities. See United States v. Davis, 530 F.3d 1069, 1082-83 (9th Cir. 2008) (distinguishing Ybarra and concluding officers possessed reasonable suspicion to frisk defendant when defendant arrived on private property that contained marijuana growing operation). Accordingly, the Court concludes that

Defendant's flight from an alleged drug operation at which there were deadly weapons, coupled with his initially uncertain identity, supported reasonable suspicion for Defendant's detention and pat-down.

However, it must be noted that, pursuant to the Stop and Frisk Act, a detention shall not exceed fifteen minutes, "shall not extend beyond the place where it was first effected or the immediate vicinity thereof[,]" and the person "shall be released" if there is no probable cause for arrest. 8 GCA §§ 30.30, 30.40. The pat-down of Defendant near the premises yielded nothing, his detention lasted well beyond fifteen minutes, and the second pat-down occurred after he was transported to the Tiyan station. Thus, the reasonableness of the Defendant's detention near the residence cannot support Defendant's continued detention and the eventual pat-down and interview that yielded the evidence he now seeks to suppress. The Court therefore turns to the Government's proffered rationale for denying Defendant's Motion.

## III.    Detention Incident to Execution of Search Warrant

The Government maintains that suppression is unwarranted because Defendant was properly detained under Summers and Bailey. In Michigan v. Summers, the Court held that, where the defendant was detained on a walk leading down from the front steps of the house to be searched, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. 692, 705 (1981) (internal citations omitted). The Court emphasized three law enforcement interests that justify the suspicionless detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight. Id. at 702-03. In Bailey v. United States, the Court reiterated the holding of Summers but declined to extend the scope of permissible detention to a situation in which officers observed the defendant leaving an apartment shortly before executing a search warrant yet detained him approximately a mile away. 133 S. Ct. 1031, 1036 (2013). The Court held that an officer's authority to detain an occupant under Summers is limited to the "immediate vicinity" of a premises to be searched. Id. at 1042.

Here, Defendant was sitting five to ten feet from the residence and the scope of the search warrant extended to the "residence, surrounding area, and vehicles." Surely the police could not maintain safety, complete the search in an orderly fashion, and prevent flight by letting an unidentified person flee the premises upon seeing the police. Moreover, the Court is

not persuaded that such detentions are permissible only when applied to persons who reside in the place to be searched, as the Supreme Court in Summers and Bailey repeatedly referred to "occupants" and federal appellate courts have explicitly construed those decisions to extend to the detention of persons on or near a given premises. Davis, 530 F.3d at 1081-82; United States v. Sanchez, 555 F.3d 910, 917-19 (10th Cir. 2009); United States v. Bohannon, 225 F.3d 615, 616-17 (6th Cir. 2000). Officers likewise acted within their authority in handcuffing Defendant. See Muehler v. Mena, 544 U.S. 93, 98 (2005) ("The governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises."). The Court therefore concludes that Defendant's detention incident to the execution of the search warrant was plainly permissible.

Although Defendant's initial detention was permissible under the Stop and Frisk Act and Terry as well as Summers,[3] neither result is dispositive of Defendant's Motion. The evidence Defendant seeks to suppress was not recovered or elicited from him until approximately 90 minutes after police commenced execution of the warrant, i.e., after he was handcuffed, advised of his Miranda rights, and transported by police to the Tiyan station.[4] In addition, Defendant's outstanding arrest warrant was unknown to officers until Defendant volunteered such information at the Tiyan station. The Court therefore must determine whether the applicable case law permits the admission of evidence gleaned from Defendant's prolonged detention.

The Court is mindful that the rule set forth in Summers permits police to detain an occupant for the duration of a search. Muehler, 544 U.S. at 98 (determining that a person's

---

[3] The Government "do[es] not concede Terry is applicable to this case" and takes the position that "Terry is not implicated" by the particular facts of the case. As discussed above, however, the facts presented are susceptible to analysis under Terry (and the Stop and Frisk Act) as well as Summers. These two lines of inquiry are distinct but related and, as here, may arise from one factual scenario. See e.g., Bailey, 133 S. Ct. at 1039 ("And, where there are grounds to believe the departing occupant is dangerous, or involved in criminal activity, police will generally not need Summers to detain him at least for brief questioning, as they can rely instead on Terry."); United States v. Taylor, 716 F.2d 701, 707-09 (9th Cir. 1983) (addressing defendant's detention incident to execution of search warrant as well as Terry stop).

[4] The record indicates that Defendant was apprehended, patted down, hand-cuffed, and read a Miranda warning within five minutes of 6:15 P.M., then patted down again at the Tiyan station at 7:45 P.M. The record is unclear, however, as to when he was transported to the Tiyan station.

detention for the duration of the search was reasonable under Summers because a warrant existed to search the residence and she was an occupant of that address at the time of the search); Croom v. Balkwill, 645 F.3d 1240, 1251 (11th Cir. 2011) ("Summers permits the continued detention of lawfully detained occupants of a premises during the length of a routine and diligently pursued warranted search thereof."). In the instant matter, though, the Government offers no authority to support its position that the police permissibly transported Defendant to the Tiyan station. While Summers and its progeny permit detentions at or in proximity to the premises targeted by a search warrant, the cases do not authorize detentions in a police station incident to the execution of search warrant at a private residence. See Bailey, 133 S. Ct at 1042 ("petitioner was detained at a point beyond any reasonable understanding of the immediate vicinity of the premises in question"). The Government also offers no evidence of the nature or duration of the search. And, even assuming the search justifiably continued for 90 minutes or more, it is not clear how Defendant's continued detention and transportation to the Tiyan station served the law enforcement interests of officer safety, facilitating the completion of the search, and preventing flight. While undoubtedly paramount when officers searched for drugs and deadly weapons and responded to Defendant's flight, these interests diminished in force once officers removed Defendant from the scene. Since neither the initial stop and frisk nor the detention incident to the execution of the search warrant supports admission of the evidence at issue, the Court considers the circumstances of Defendant's arrest.

## IV. Arrest

A warrantless arrest "is per se unreasonable unless it falls within [one of] the specifically established and well delineated exceptions[,]" such as when an arrest is made upon probable cause. Tuncap, 2014 Guam 1, ¶ 14 (citations omitted). Determining whether an arrest occurred requires "taking into account all of the circumstances surrounding the encounter, to determine whether the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Id., ¶ 17 (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)) (internal quotations omitted). The line between an investigatory detention and an arrest is crossed "when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." Hayes v. Florida, 470 U.S. 811, 816 (1985); Dunaway v. New York, 442 U.S. 200,

216 (1979) (holding that police violated Fourth Amendment when, absent probable cause, they seized person and transported him to police station for interrogation); see also Centanni v. Eight Unknown Officers, 15 F.3d 587, 591 (6th Cir. 1994) ("While the line between a reasonable Terry 'stop' and de facto arrest is often unclear, it is quite apparent that there is no such thing as a Terry 'transportation.' Rather, the removal of a suspect from the scene of the stop generally marks the point at which the Fourth Amendment demands probable cause.").

The evidence demonstrates that officers subdued Defendant, handcuffed him, patted him down for weapons, discovered no contraband, transported him to the Tiyan station, patted him down again, discovered contraband, and then elicited incriminating statements from him. Considering the totality of the circumstances, and regardless of whether it initially was conducted pursuant to the Stop and Frisk Act and Terry or Summers, the Court concludes that Defendant's detention near the premises in Dededo converted into an arrest upon his transport to the Tiyan station; that is, a reasonable person in Defendant's position would believe that he was not free to leave. Further, there is no evidence to suggest—nor does the Government contend—that Defendant's transportation to the Tiyan station derived from Defendant's consent[5] or from probable cause with respect to any particular crime. Accordingly, it cannot be said that, once officers completed the fruitless pat-down near the premises, "the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing a crime." Tuncap, 2014 Guam 1, ¶ 21 (quoting Cundiff, 2006 Guam 12, ¶ 26; Beck v. Ohio, 379 U.S. 89, 91 (1964)) (internal quotations omitted). Pursuant to Summers, officers were justified in continuing to detain Defendant on the premises for the duration of the search once the first pat-down was complete, but they were not entitled to transport Defendant to the Tiyan station to subject him to an additional frisk and questioning; the latter constituted an unlawful arrest that yielded unlawfully obtained evidence. Consequently, the physical evidence and statements at issue shall not be admissible against Defendant unless there is independent evidence "that would break the causal connection" between the unlawful arrest and the evidence obtained at the Tiyan station. See Cundiff, 2006

---

[5] Defendant apparently was not handcuffed at some point at the Tiyan station, since he removed the contraband from his pocket upon the officer's request. There is no contention that this equated to consent, nor does the Court construe it as such.

Guam 12, ¶ 41 (citing <u>Oregon v. Elstad</u>, 470 U.S. 298, 306 (1985)); 8 GCA § 30.60 (evidence seized by officer in violation of Stop and Frisk Act shall not be admissible against defendant).

## V.    Inevitable Discovery

The Government submits that even if there is "some constitutional defect in [Defendant's] detention, the arrest warrant outstanding for him made the discovery of the evidence on his person inevitable." The doctrine of inevitable discovery "permits the government to rely on evidence that ultimately would have been discovered absent a constitutional violation[]" provided the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[.]" <u>United States v. Ruckes</u>, 586 F.3d 713, 718 (9th Cir. 2009) (quoting <u>Nix v. Williams</u>, 467 U.S. 431, 443-44 (1984)) (internal quotations and punctuation omitted); <u>see also</u> <u>People v. Santos</u>, 2003 Guam 1, ¶ 56 (applying <u>Nix</u>). Importantly, courts have "recognize[d] the danger of admitting unlawfully obtained evidence 'on the strength of some judge's speculation that it would have been discovered legally anyway[.]'" <u>United States v. Romero</u>, 692 F.2d 699, 704 (10th Cir. 1982) (quoting <u>United States v. Castellana</u>, 488 F.2d 65, 68 (5th Cir. 1974), rev'd on other grounds, 500 F.2d 325 (5th Cir. 1974) (en banc)).

Here, it would be speculative to conclude by a preponderance of the evidence that the contraband found on Defendant inevitably would have been discovered as a result of the outstanding arrest warrant. Police had ample opportunity to detain Defendant, identify him, and ascertain the existence of outstanding warrants while executing the search warrant at the residence, but they failed to do so. Indeed, it was not until Defendant was transported to the Tiyan station that *he informed officers* of the arrest warrant. The Government set forth no evidence, for example, regarding police practices that would support the conclusion that the arrest warrant inevitably would be discovered. The Court accordingly finds that the unlawfully obtained evidence is not admissible based on the doctrine of inevitable discovery. The challenged evidence must be suppressed because the contraband and statements were "come at by exploitation of the initial illegality," i.e., the unlawful arrest, and not "by means sufficiently distinguishable to be purged of the primary taint." <u>See</u> <u>Cundiff</u>, 2006 Guam 12, ¶ 41 (citing <u>Segura v. United States</u>, 468 U.S. 796, 804-05 (1984)) (internal brackets omitted).

## CONCLUSION

In light of the foregoing, the Court GRANTS Defendant Aldan's Motion to Suppress Statements, Physical Evidence such that the Government may not introduce as evidence at trial against Defendant "a plastic straw containing suspected methamphetamine residue and all oral and written statements made to Officers T. A. Supnet and J. A. Santos of the Guam Police Department on March 21, 2014 and all other evidence derived therefrom." Trial Setting is set for September 23, 2014 at 3:00 P.M.

**IT IS SO ORDERED** this day of September 16, 2014.

_____
HONORABLE ALBERTO C. LAMORENA III
Presiding Judge, Superior Court of Guam

SERVICE VIA COURT BOX
I acknowledge that a copy of the original hereto was placed in the court box of:

T. Tumbler ; AG

Date: 9/16/14 Time: _____

Deputy Clerk, Superior Court of Guam

ORIGINAL